**PACIFIC OIL COMPANY, Plaintiff,**

v.

**Stewart L. UDALL, Secretary of the Interior of the United States of America, Defendants.**

**Civ. A. No. 9406.**

United States District Court
D. Colorado.

Sept. 12, 1967.

Peter H. Holme, Jr., and A. Edgar Benton, Holme, Roberts & Owen, Denver, Colo., for plaintiff.

Lawrence M. Henry, U. S. Atty. for the District of Colorado, by David I. Shedroff, Asst. U. S. Atty., and by Thomas L. McKevitt, Atty., Lands and Natural Resources Division, Justice Dept., Washington, D. C., for defendants.

## FINDINGS AND OPINION

WILLIAM E. DOYLE, District Judge.

The above action was tried to the court and although testimony was taken, this was for the most part clarifying with respect to the administrative action taken by the Department of the Interior. Essentially it is a review of these administrative determinations and dispositions. Plaintiff is the alleged successor in interest and owner of allegedly valid oil shale placer mining claims located in Garfield County, Colorado.[1] This is one of a series of so-called oil shale cases. The plaintiff seeks to set aside a series of adverse administrative decisions concerning the claims in question and also seeks a declaration of their validity and an order directing the secretary to issue patents or a remand to the Department of the Interior for further proceedings.

Jurisdiction exists. It arises on the basis of 28 U.S.C. §§ 1331, 1361, the Declaratory Judgment Act, 28 U.S.C. §

---

1. Specifically, the Victory Numbers 1 through 5, 8, through 29, and Bitumen Numbers 1 through 8, 11, 14 and 15.

2201, the Administrative Procedure Act, 5 U.S.C. § 1009 and the Mining and Public Land Laws of the United States, 30 U.S.C. §§ 22–38 inclusive. Briefs have been filed and the case now stands submitted.

Like the other oil shale cases, this one involves an extensive review of administrative history and action, most of which took place during the 1920s and 1930s. In order to understand the cases it is invariably necessary to set out the facts at some length.

*History of Victory 1 through 5, 8 through 29 and Bitumen 1 through 8, 11, 14 and 15*

It all began on March 4, 1918 when P. C. Thurmond, together with others located the Bitumen Nos. 1 through 8, 11, 14, 15, 18, 24 through 26. On April 5, 1918, he located Victory Nos. 1 through 5, 8 through 29 and French Nos. 1 through 12, 25 through 31. For our purposes at least it can be said that the locators of all of these claims were the same.[2] The controversy here revolves around a certain agreement which was entered into on March 30, 1918, after some of the claims were located but before others were located. This agreement was between Thurmond and one Dr. George Sibbald, under which Thurmond agreed to locate and survey the Bitumen, Victory, French and "G. W. S." oil shale claims for Sibbald in return for considerations provided in the agreement.[3]

2. Bitumen and Victory Groups: P. C. Thurmond, Coral Thurmond, F. N. Juhan, Elizabeth Juhan, Joe T. Juhan, Joe Gregory, James E. Ford, M. M. Ford.

French Group: P. C. Thurmond, Coral Thurmond, F. N. Juhan, Elizabeth Juhan, James E. Ford, M. M. Ford, W. S. Parkison, C. W. Taylor.

3.                Thurmond-Sibbald Agreement:
    "P. C. Thurmond, First Party                 AGREEMENT
                    to                      dated March 30, 1918
    George Sibbald, Second Party

"Recites that P. C. Thurmond agrees to locate and survey for George Sibbald the following oil shale claims, situated Garfield County, Colorado, provided that said Thurmond is able to get valid locations and filings of said land made before other parties accomplish this, THE BITUMEN GROUP; the G.W.S. GROUP and THE VICTORY GROUP and FRENCH GROUP as shown on a blue print furnished the said Sibbald. It is further agreed by and between the parties of the first and second parts said George Sibbald is to pay P. C. Thurmond the sum of $600. for each and every section so located and surveyed; further that the said party of the second part is to pay first party in advance $450. per month, on the 10th day of each and every month to help defray the expense of locating and surveying said claims and the balance of said money upon the sale of said claims. It is further agreed that the party of the second part reserves the right to sell one or more sections of this land at his option and at the time of the sale the second party agrees to pay to the first party $100. for each section sold, at the time of signing the contract of sale; $200. on each section sold in 30 days after date of sale; $200 on each section sold in 60 days after date of sale; and the balance of the $100 on sections sold at the expiration of 90 days after sale of same.

"It is further agreed that the money advanced for expenses shall be divided by the total number of sections upon which same is expended and that the result shall be considered to be the sum expended upon one section and that in holding back this money in settlement when land is sold ⅙ of the amount expended on the section or sections sold shall be deducted from the first payment, ⅓ from each of the next two payments and ⅙ from the last payment, the consideration of the above contract is $100. to be applied on first monthly payment of $450. due the party of the first part on April 10, 1918.

"Filed for the record June 15, 1918 at 9:00 o'clock a.m. and recorded in book 103 at page 413 thereof."

As noted, the Bitumen Group had been previously located as of the date of the signing of the agreement. During the next five years as a result of conveyances from co-locators to Thurmond and from Thurmond to Sibbald and also conveyances from Sibbald to Edward B. Wheeler, the Wheeler Shale Company, the plaintiff's predecessor in interest, became the record owner of the Bitumen Claims Nos. 1 through 17 and Victory Claims Nos. 1 through 29.[4] Thereafter, during the years 1926 and 1927, Wheeler Shale Company filed mineral patent applications covering the Bitumen and Victory groups, including all of the claims involved in the present action.[5]

The Department of the Interior, on February 13, 1929, started Contest No. 11946 against all of these applications asserting that the locators were not equally interested to the extent of 20 acres per locator; that the claims were essentially located for the use and benefit of George B. Sibbald and alleging further that locators F. N. Juhan and Elizabeth Juhan were dummy locators.[6] Wheeler Shale Company filed its answer in which it denied the charges and a hearing was then set for October 6, 1932.

The failure of Wheeler to appear at the hearing and the filing by it of the petition asking that the matter be determined on the record as it then stood is one of the embattled areas of the case. In this petition, Wheeler asserted that it did not have sufficient funds with which to continue to prosecute the contest and thus, that it could not appear at the hearing. It requested that the matter be determined on the record. The company also requested that its "purchase price", that is, funds advanced by it in connection with the patent applications be repaid to it if the decision should be adverse. The "hearing" occurred on January 12, 1933. Wheeler representatives failed to appear and the Commissioner of the General Land Office issued a decision noting the non-appearance and declaring the claims null and void. In fact, the proceeding was treated as a default and a formal hearing was not held. On that occasion the Commissioner said:

"The fact that the Wheeler Shale Company has conveyed certain of the claims since the issuance of final certificates, and is financially unable to defend the entries in question against the charges preferred against them is no warrant for dismissing the adverse proceedings instituted against the entries and the failure to appear on the date set for the hearing and submit testimony controverting the charges preferred against the entries, is taken as an admission of the truth of the charges and mineral entries 037742, 037743, 037744, 037745, 037756, 038545 are hereby canceled and the Victory Nos. 1 to 29, inclusive, and Bitumen Nos. 1 to 17, inclusive, oil shale placer claims are declared to be null and void."

Following this, Wheeler executed to the United States a quit claim deed which purported to convey all of its right, title and interest in and to the Bitumen and Victory claims. The consideration was refund of the "purchase price". Moreover, no appeal was taken by Wheeler to the Secretary of the Interior from the Commissioner's decision.

It was not until 1952 and 1953 that any further step was taken. In those years Langdon H. Larwill and Horace

---

4. Plaintiff's Exhibit 1A12.

5. Denver Mineral Patent Applications, 037742, 037743, 037744, 037745, 037756 and 038545, covering Victory Claims Nos. 1 through 29 and Bitumen Claims Nos. 1 through 17.

6. Sections 2330 and 2331 of the Revised Statutes, 30 U.S.C. §§ 35, 36, provide that no placer mining location made after May 10, 1872, shall include more than 20 acres for each individual claimant and that no location of a placer claim made after July 9, 1870, shall exceed 160 acres for any one person or association of persons. These provisions have been construed to mean that from and after May 10, 1872, no location can exceed 20 acres for each individual participating therein. 43 C.F.R. § 3416.1.

G. Slusser, surviving trustees of the then dissolved Wheeler Shale Company, filed patent applications on the Bitumen and Victory claims which are here in issue.[7] These applications failed to disclose on their faces that the claims had been previously declared null and void. Plaintiffs have offered evidence to establish that this information was furnished to personnel of the Department of the Interior even though the applications did not contain it, and that they were advised to file new applications rather than petitions for reopening and reconsideration. In any event, on March 5, 1956, the Manager of the Colorado Land Office approved the Bitumen claims for patent[7a] and initiated Contest No. 126 against the Victory claims.[7b] This contest challenged the Victory claims on essentially the same grounds as had been asserted in Contest No. 11946 supra, which included the dummy locator charge. Patents were not thereafter issued because before the contest proceedings were held, the manager summarily rejected the applications, canceled the mineral entry issued for Bitumen Nos. 2, 3, 6 and 8, and closed the proceedings in Contest No. 126. The basis for this action was that the Department had learned that the claims had been declared null and void in 1933. These decisions were as indicated by the Manager and were dated April 21, April 22 and May 1, 1959. This time an appeal was taken to the Director of the Bureau of Land Management, asserting (a) that the Commissioner's 1933 decision was ineffectual because it was based on Wheeler's default rather than on the merits; (b) that the Commissioner had no jurisdiction to declare the claims null and void since Contest No. 11946 was directed only toward the rejection of the patent application and cancellation of the mineral entry and (c) that the Commissioner's 1933 decision did not become final when Wheeler failed to appear and was subject to later reopening and reconsideration in the Department and should be now corrected, revised, or reversed and that the entries should be clearlisted for patent and Contest No. 126 reinstated so that the issues therein could be properly determined.

The Director affirmed the Manager by decision dated September 23, 1960. He noted that the 1933 proceedings were "entirely regular and in accordance with the Rules of Practice then in effect."[8] He also noted that the rules specifically provided that failure to appear at a contest hearing "without showing good cause therefor" would be taken as an admission of the charges (citing 43 CFR, 1940 ed. § 222.9) that the original application had requested and received a refund and that there was no basis, equitable or legal, for reopening the procedure after a period of some twenty-six years acquiescence in the Commissioner's decision. An appeal was taken to the Secretary of the Interior who, through the Assistant Solicitor for Land Appeals, affirmed the Director's decision. This was on May 16, 1963 and provided in part as follows:

Most of the matters raised on this appeal have been considered in recent cases involving circumstances very similar to those of this case. The Department has held that where mining claims have been declared null and void pursuant to regular proceedings and the mining claimants acquiesce in such decisions for many years, the decisions nullifying the claims are conclusive and will not be reopened in the absence of a legal or equitable basis warranting reconsideration. (Gabbs Exploration Company, 67 I.D. 160 (1960); Gabbs Exploration Company, A–28213 (May 24, 1960) and A–28213 (Supp.) (July 11, 1960); Garfield County Exploration Company, A–28351 (August 30, 1960).) (The

---

7. See Note 1, supra. These applications were designated Colorado Mineral Patent Applications 04383, 04384 and 07395.

7a. Plaintiff's Exhibit 1A35.

7b. Plaintiff's Exhibits 1A36, 1A37.

8. Citing 43 CFR, 1940 ed. Part 222; Circ. 460, 44 L.D. 572.

last-cited case rejected an application for patent on Bitumen No. 18 which is one of the same group of claims as the Bitumen claims here applied for.) There is no basis for differentiating the patent applications here involved from those considered in the Gabbs and Garfield cases with respect to the mining claimants' long acquiescence in default decisions nullifying the claims and the absence of a persuasive legal or equitable basis warranting reconsideration of those decisions.

\* \* \* \* \* \*

The appellants argue that \* \* \* the Commissioner's decision did not become final when no appeal was taken, but was subject to being reopened by subsequent action of the applicant. When, in 1952, the appellants filed the applications for patent here under consideration, they contend, in effect, that they applied for a reconsideration of the Commissioner's decision within the requirement of paragraph 10 [paragraph 10 of Department Circular 460, 44 L.D. 592 (1916)]. The contention is of no avail. An application for reconsideration must be filed within a reasonable time. \* \* \* [A] request for reconsideration which is filed 20 years after the decision in question was issued is not filed within a reasonable time.

In discussing the procedure which led up to the Commissioner's decision of 1933, the appellants argue that a decision on the merits should have been entered in 1933 and that the default decision was improper in view of the fact that the contestee had filed an answer denying the charges and other material in the contest proceeding and requested a decision on the merits. \* \* \* After acquiescing in the Commissioner's decision for almost 20 years, the appellants' objection to the form of the decision is made too late.

The appellants' further contention that at most the Commissioner was authorized only to cancel the mineral entries and reject the patent applications in the 1933 default decision and that he had no authority to nullify the claims is erroneous for the reasons discussed in the *Gabbs Exploration Company* cases, supra. In addition, since the charges against the claims here involved, to the effect that the claims were fraudulently located, if proved, would necessitate a decision that the claims were null and void, no possessory right under the mining laws in land covered by such claims could survive. Neither could any possessory right in the claims survive a default decision terminating a contest charging that claims were fraudulently located. Since the failure of the contestee to attend the hearing ordered was taken as an admission by the contestee of the truth of the contest charges, the default decision necessarily concluded that the claims were null and void.

It is noteworthy that the plaintiff here had to do with the 1952 and 1953 patent applications. These were filed pursuant to an October 12, 1951 agreement between the Wheeler trustees, applicants and the plaintiff.[8a] This agreement provided that the plaintiff acquired the right to purchase the Bitumen and Victory claims and agreed to advance funds to the trustees to meet the cost of patenting. Plaintiff alleges here that as of January 1, 1963, it had paid out approximately $90,000.00 for this purpose. On that date a supplemental agreement[8b] was entered into under which the trustees would convey the claims to plaintiff in advance of the issuance of the patents. It is alleged that on or about January 24, 1963, plaintiff paid an additional $63,000.00 and a deed to the claims was deposited in escrow and was to be delivered on plaintiff's request and on the payment of an additional $1,000. This final payment was made and the deed[8c] was delivered to plaintiff by the escrow agent on September 7,

---

8a. Plaintiff's Exhibit 1K.

8b. Plaintiff's Exhibit 1L.

8c. Plaintiff's Exhibit 1M.

1965. On September 24, 1965, plaintiff commenced the present action.

The facts as related above are not disputed, but plaintiff maintains that they fail to tell the entire story and that other parallel history must also be examined and compared in order to fully realize the inconsistency of the Department's decisions. Plaintiff calls attention to the history of other oil shale claims which were also located by Thurmond in 1918. These are the Bitumen Nos. 18 and 24 through 26, and the French Nos. 1 through 12 and 25 through 31. Patent applications for these claims were filed by their owners during the same period in which Wheeler Shale Company applied for patents on the Bitumen Nos. 1 through 17 and Victory Nos. 1 through 29 noted above. Some of these applications were approved and patents were actually issued. Others, including those which relate to the claims involved in this action, were denied. Plaintiff contends that when you consider the total picture, the actions of the Department in indiscriminately granting and denying patents for claims located at the same time by pretty much the same locators are entirely inconsistent, contradictory, contrary to law and constitute uneven administration of justice. This alleged administrative caprice together with the plaintiff's contention that their present claims have never been considered on their merits, but were the victims of arbitrary procedure in 1933, forms the basis for this present action.

### The French Nos. 12 and 25 Claims

To gain insight regarding the plaintiff's contention, it is necessary to examine the action by the Department in respect to the French Nos. 12 and 25 Claims. An application for patent on these was filed by one Rea L. Eaton on July 19, 1922. An examination was made by a field investigator of the General Land Office and he recommended that adverse proceedings be brought against the claims. The investigator made essentially the same assertion which was later made in Contest No. 11946 against the Wheeler applications: this was that the locations under the Thurmond-Sibbald agreement were solely for the benefit of Thurmond and Sibbald and that the other "co-locators" did not share equally in the subsequent sale of the claims by Thurmond to Sibbald and were therefore used as dummies.[9] This recommendation was rejected by the Chief of the Denver Field Office who recommended approval of the patent application on the ground that further information had shown that the Thurmond-Sibbald agreement was never carried out and that the other co-locators had benefited from their interests in the claims.

Thereafter, the claims were clearlisted by the Acting Commissioner in his memorandum dated October 26, 1922. This stated, in part, "the record does not show that the agreement was ever carried into effect, or * * * that it was * * * intended to be one by which either Sibbald or Thurmond would obtain claims in violation of the placer mining laws." [10] Following this approval, patents were issued to Rea L. Eaton on April 27, 1923, for the French Nos. 12 and 25.

### The French Nos. 1 through 11, 26 through 31 and Bitumen Nos. 25 and 26 Claims

On August 26, 1925, Eaton filed application for patents on the French Nos. 1 through 11 and 26 through 31. These he had purchased from Thurmond and Sibbald in 1921. The Department instituted contest proceedings.[11] In these proceedings it raised the same assertions that it was later to make in the Wheeler cases. This was, of course, that the locators were not equally interested to the extent of 20 acres per locator; that the claims were located for the use and benefit of Sibbald, and that F. N.

9. Plaintiff's Exhibit 2f, letter from Oral J. Berry, Mineral Examiner, General Land Office, to the Commissioner of the General Land Office, dated August 1, 1922.

10. Plaintiff's Exhibit 5F.

11. Contest No. 11596, June 23, 1927.

Juhan and Elizabeth Juhan were dummy locators. This was notwithstanding that these charges had previously been made and rejected in connection with the patenting of the French Nos. 12 and 25 claims just mentioned.

On March 22, 1929, the Garfield County Exploration Company submitted patent applications covering Bitumen Nos. 25 and 26. On March 22, 1930, the Department initiated contest proceedings but it did not attack the validity of the locations. The contest was for failure to perform annual assessment work. This failure to mention invalidity of locations was despite the fact that Contest Nos. 11596 and 11946 were then pending.

On July 3, 1930, the Commissioner of the General Land Office dismissed the contest against the Bitumen Nos. 25 and 26 on the ground that his office lacked jurisdiction to invalidate for failure to perform annual assessment work. But on the same day he entered an order holding the French Nos. 1 through 11 and 26 through 31 null and void because of dummy locators[12] (thus adopting the opposite view from that previously applied to the French Nos. 12 and 25). Patents to Bitumen Nos. 25 and 26 were subsequently issued (on April 3, 1931). No question was raised as to the bona fides of the locators.[13]

After the decision that the French Nos. 1 through 11 and 26 through 31 were null and void, Eaton, in 1932, executed and filed a quit-claim deed to the claims in favor of the Government and received a refund of the money deposited at the time of the patent application. But many years later, in 1950, Eaton re-applied for patents on these same claims and this time was successful. Patents thereon were granted on August 20, 1951.[14]

### The Bitumen Nos. 18 and 24 Claims

On June 29, 1928, the Shale Oil Syndicate, Inc. applied for patent on the Bitumen No. 18. The Department commenced adverse proceedings on July 16, 1930, on the ground that the claim was affected by the Thurmond-Sibbald agreement and hence was "fraudulently located for the use and benefit of George B. Sibbald."[15] On January 10, 1933, the Commissioner entered a default judgment in favor of the Government on the ground that the applicant had failed to appear at the contest hearing, and held the claim to be null and void.[16]

In 1956, the Garfield County Exploration Company purchased Bitumen No. 18 from the Shale Oil Syndicate, Inc., and thereafter, on June 17, 1957, filed a new patent application. Thus, the position of Garfield on this claim was the same as that of the plaintiff on the claims involved in this action. Both parties have sought to obtain patents on claims included in the Thurmond-Sibbald agreement which previously had been declared null and void. Garfield's application for Bitumen No. 18 was successively rejected by the Manager of the Denver Land Office, the Director of the Bureau of Land Management, and the Solicitor, Department of the Interior, the latter stating, in part:

In addition to the procedural objections, the appellant denies that Bitumen No. 18 was fraudulently located and argues extensively in support of this position. However, since the Commissioner's decision that the claim was null and void became final more than 25 years ago, the merits of the contest will not be reconsidered here. The failure of Shale Oil to take an appeal from the Commissioner's decision declaring the Bitumen No. 18 null and void bars Shale Oil or anyone

12. Plaintiff's Exhibit 1G1. The Commissioner's decision was affirmed by the Secretary on June 8, 1939 (Plaintiff's Exhibit J) and re-affirmed on March 22, 1932 (Plaintiff's Exhibit K).

13. Plaintiff's Exhibit 1C3.

14. Plaintiff's Exhibit G4.

15. Plaintiff's Exhibits 1D and 2D.

16. Plaintiff's Exhibit 3D. This holding was based upon the same rules of practice relied upon in the 1933 proceedings nullifying the claims which plaintiff now seeks to patent. See Note 8, supra.

claiming under it, from a reconsideration of the merits of the case. There is no equitable basis for reopening the contest proceeding now. Between 1933 and 1956, the appellant's predecessor in title took no action with respect to the decision that the claim was invalid. The notation in the tract book, the official record showing land status, that the claim was null and void and the case closed in 1933 gave the appellant constructive notice of the fact that the United States claimed ownership of the land. In the circumstances, the appellant was bound to inquire further whether Shale Oil had a possessory interest in the Bitumen No.18 which it could sell. Where, as here, the default judgment was regularly rendered after notice and opportunity for hearing, where there are no equitable considerations justifying reconsideration, and interests under an oil and gas lease issued by the United States have intervened, the Department will not reopen adverse proceeding in a contest case which was finally closed more than twenty-five years ago (H. W. Rowley, 58 I.D. 550 (1943); Edward Christman et al., 65 I.D. 127 (1955); Gabbs Exploration Company [67 I.D. 160, 165 (1960)].)

Decision of the Solicitor, Department of the Interior, dated August 30, 1960, pp. 5–6.

Garfield applied for patent on the Bitumen No. 24 on March 24, 1929, at the time it made application for the Bitumen Nos. 25 and 26. While the Department was preparing to contest the claim for failure to perform annual assessment work, Garfield expressed its intention to withdraw the application and it was thereafter rejected on September 6, 1929, without contest.[17] Garfield re-applied in 1956. On July 6, 1960, less than two months prior to its rejection of the Bitumen No. 18 application, the Department issued a patent to Garfield on Bitumen No. 24 without challenging the bona fides of the locators.[18] This, plaintiff asserts, was the

"culmination of chronic administrative inconsistencies affecting the claims referred to in the Thurmond-Sibbald agreement * * * *"

In view of the various actions taken by the Department with respect to the numerous claims, a summary or box score will be helpful to a comprehensive understanding. The Department has patented 22 of the claims covered by the Thurmond-Sibbald agreement. It has rejected patent applications on 39 other such claims.

The French Nos. 12 and 25 were patented in 1923. In 1930, however, the patents were refused on the French Nos. 1 through 11 and 26 through 31. Subsequently, however, in 1951 these were granted.

In 1931 patents for the Bitumen Nos. 25 and 26 were granted. In 1933, however, the Department rejected applications to patent Bitumen No. 18 and all of the claims to which plaintiff now asserts an interest, i. e., the Bitumen Nos. 1 through 8, 11, 14 and 15 together with the Victory Nos. 1 through 5 and 8 through 29.

The Department in 1960 patented Bitumen No. 24, but in the same year refused to patent Bitumen No. 18.

In 1963 the Department rejected applications to patent plaintiff's Bitumen and Victory claims.

The net result is that all of the French claims have been patented and patents have been refused for all of the Victory claims and all of the Bitumen claims with the exception of Nos. 24, 25 and 26.

### Plaintiff's Contentions

Plaintiff's argument is that the Department in 1933 issued patents on the French Nos. 12 and 25. This constituted a conclusive affirmation of the Department's recognition of the bona fides of the locators of all claims referred to in the Thurmond-Sibbald agreement and that it had the effect of establishing a rule of property applicable to all such claims, and it thus vested in its prede-

---

17. Plaintiff's Exhibit 1E1.

18. Plaintiff's Exhibit 3E.

cessors the property right. The further argument of plaintiff is that Wheeler and the other owners of the Thurmond-Sibbald claims were entitled to and did rely on the French Nos. 12 and 25 patent as a conclusive adjudication of the bona fides of the locators, and that the Department's subsequent reversal "effectively deprived Wheeler of its property without due process of law." Plaintiff's more specific arguments are as follows:

(a) That Wheeler's financial inability to appear at the 1933 hearing was "good cause" within the Departmental rule,[19] and the Department erred in entering a default judgment on Wheeler's patent applications;

(b) That if Wheeler's financial inability was not "good cause," the most the Department could do was to deny the patent application; that it had no authority to declare the *claims* null and void;

(c) That the quitclaim deed executed by Wheeler following the 1933 decision served only to terminate its rights under the patent applications and to permit recovery of the monies deposited therewith; that the deed was not intended as an abandonment of Wheeler's claims and in no way affected its underlying possessory title therein;

(d) That the new patent applications filed by the Wheeler trustees in 1952 and 1953 were the most appropriate and expeditious means to obtain a decision on the validity of the claims;

(e) That under the doctrine of "supervisory authority," the Secretary of the Interior has discretionary authority to reverse a decision of his predecessor; that the Secretary asserted such jurisdiction over the new (1952 and 1953) patent applications and could not thereafter exercise this jurisdiction arbitrarily or capriciously;

(f) That the Department's summary reversal of its 1956 decision to clearlist the Bitumen claims and contest the Victory claims was a denial of due process; and

(g) That the doctrine of laches is not applicable to this case.

The contentions and argument of the Secretary are first, that the proceedings in 1933 declaring the Bitumen and Victory claims null and void were final; that plaintiff's predecessors failed to appeal these rulings and thus any property that Wheeler had was effectively wiped out as the result of the action of the Department. Accordingly, the surviving trustees of Wheeler had nothing and no property interest to transfer to the plaintiff; that the most that they had to give was a cause of action and therefore, the plaintiff has no standing to even sue.

Second, the Secretary argues inasmuch as the Victory and Bitumen claims were declared null and void in 1933, that the only right that plaintiff and the surviving trustees had was to reconsider the 1933 decision (see West v. Standard Oil Company, 278 U.S. 200, 210, 49 S.Ct. 138, 73 L.Ed. 265 (1929). They point out that this proceeding is not followed. Here the surviving trustees filed a new patent application which did not disclose the previous history. Nevertheless, the Secretary considered the arguments and concluded that there was no reason for vacating the 30-year old decisions, noting the ruling in Court of Appeals for the District of Columbia in Gabbs Explora-

---

19. The pertinent Departmental regulation applicable to the Wheeler contest provided:

[Failure * * * to appear at the hearing ordered *without showing good cause therefor* * * * will be taken as an admission of the truth of the charges and will obviate the necessity for the Government submitting evidence in support thereof, and the register and receiver will forthwith forward the case with recommendation thereon to the General Land Office and notify the parties by registered mail of the action taken. In cases finally closed upon default of claimant, if application to reopen any case is filed with the register and receiver, they will forthwith forward same with recommendations to the General Land Office.

Circular 460, paragraph 10, 44 L.D. 572 (1916) (Emphasis supplied.)

tion Company v. Udall, 114 U.S.App.D.C. 291, 315 F.2d 37, cert. denied 375 U.S. 822, 84 S.Ct. 61, 11 L.Ed.2d 56.

Third, it is argued that there is no showing that the Secretary acted arbitrarily and proof of this would be necessary in order to justify the granting of relief by this court.

## I.

Whether the plaintiffs have standing to sue seems somewhat beside the point. If we conclude, and we do, that the 1933 proceedings were valid and that all rights to the property reverted to the United States, the question of standing to sue fades out. If the surviving trustees had no properties to convey the plaintiff took nothing by his purchase from the surviving trustees. The trustees had only a right to request reopening and reconsideration. Whether the Department acted arbitrarily in its refusal to exercise supervisory authority ought to be examined on the merits.

■ Plaintiff's assertion that the Wheeler officers were without funds with which to appear and defend the contest can be taken as undisputed. It does not follow from this, though, that "good cause" existed for Wheeler not to appear. The Law Officer presiding recommended the entry of a default judgment and it was thus determined that the excuse was not "good cause." As we view it, this was a proper exercise of discretion. Certainly a litigant in a court case would not be heard to say that the court was powerless to find that the excuse was not "good cause" and to enter a default. Undoubtedly, many court litigants have suffered default judgments on this account. The applicable Departmental regulation left the question of good cause to the discretion of the law officer hearing the case. The ruling was not an abuse of discretion.[20]

■ Nor do we agree with plaintiff's argument that assuming Wheeler's financial ability was not good cause that the

most the Department could have done was to have denied the patent application. But the regulation provides specifically that failure to appear at the hearing without good cause would be taken "as an admission of the truth of the charges." If the charge of dummy locators is taken as true, the entry of an order nullifying the claim would logically follow. Furthermore, such "null and void" orders have been entered by the Department in other cases. See, for example, Gabbs Exploration Company v. Udall, 1963, 114 U.S.App.D.C. 291, 315 F.2d 337.

In the case at bar, we have in addition the quitclaim deed given by plaintiff's predecessors, following the denial of the patent application. Certainly this must be taken as an admission by the Wheeler Company that as of that time it no longer wished to contend and to pursue its claims.

■ It appears incongruous for plaintiff to demand full scale due process at the 1933 hearing in view of Wheeler's failure to appear and its seeming approval of the action taken as evidenced by the quit claim. The Wheeler Company was entitled to have the Department observe its own rule. In our judgment the rule was followed.

## II.

■ We regard the applications filed by Wheeler's surviving trustees in 1952 and 1953 as a request to the Secretary to exercise supervisory jurisdiction and apparently the applications were so treated once the knowledge of 1933 proceedings became a matter of record. So viewed, the granting of the request was discretionary. See Standard Oil v. West, supra. The Assistant Solicitor noted that the claims here had been declared null and void in 1933 and that the claimants had acquiesced in the decision for many years. He went on to say that under such circumstances the decision nullifying the claims is conclusive and

20. We are aware that a Department hearing officer held otherwise in the Mountain Boy case. The fact that the

officer found good cause there is not persuasive. It was a discretion judgment.

legal or equitable basis warranting re-will not be reopened in the absence of a consideration citing the Gabbs cases.[21] The decision of the Court of Appeals for the D.C. Circuit in Gabbs Exploration Company v. Udall, 114 U.S.App.D.C. 291, 315 F.2d 37 was also cited and relied on. That case involved two sets of oil shale placer claims located in 1917 and 1918 in Rio Blanco County and Garfield County, Colorado. Both were contested in proceedings instituted in 1929 on charges of failure to perform annual assessment work and abandonment. The owners of both claims were served with a copy of the contest notice but one failed to file an objection and made no appearance and the other failed to file an answer within the time allowed by the Departmental regulations. Accordingly, in 1930, the Secretary declared both sets of claims null and void and duly notified the contestees. In 1956, plaintiff purchased the claims by quitclaim deed and applied for patents thereon. The District Court granted defendant's motion for summary judgment and the Court of Appeals affirmed. The Appellate Court noted that the Secretary had no authority to declare unpatented mining claims null and void for failure to perform assessment work (citing Ickes v. Virginia-Colorado Development Corp., 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935)), but that he could do so upon a charge of abandonment. The Court then held that neither plaintiff nor its predecessors had taken timely action to have any wrong in the original proceedings corrected.

Plaintiff points out that so long as the Department of the Interior retains jurisdiction over the land in question, prior departmental decisions are not strictly *res judicata*. Of course, this is correct, for there have been cases in which the Secretary of the Interior has reopened prior decisions in order to correct error. E. g., West v. Standard Oil Co., 278 U.S. 200, 49 S.Ct.

138, 73 L.Ed. 265 (1929). Plaintiff argues that, since the Secretary has retained jurisdiction over the disputed land in this case, it follows ineluctably that he must reopen the 1929 decisions and correct any errors there appearing. The premise does not beget the conclusion.

We need not consider whether the power to reopen prior decision is merely discretionary with the Secretary or whether, indeed, the errors urged by plaintiff demonstrate that "manifest injustice has been done or the law clearly misapplied," as is required for reopening. Even if we assume that Gabbs has met these threshold objections, plaintiff's argument cannot prevail. The Department of the Interior, which has recognized the right of the Secretary to reconsider certain prior decisions, has also recognized that there must be some time limit on such reconsideration. As Assistant Attorney General Van Devanter said in Aspen Consolidated Mining Co. v. Williams, 27 L.D. 1, at 11:

"The parties remain the same and the one complaining of the former decision has taken timely and decisive action to have the alleged wrong corrected."

Here, neither plaintiff nor its predecessors in interest took timely action to have the wrong righted, and plaintiff cannot complain of the Secretary's failure to reopen the case. It is significant also that in all the cases cited to us in which a prior decision was reopened the longest period elapsing before reconsideration was three years. Here twenty-seven years have elapsed between the alleged wrong (1929) and plaintiff's attempt to have it corrected (1956). There might be some reason to impel the Secretary to reopen a prior decision in order to purge an incorrect determination, but the passage of time might prevent or greatly hinder a

21. Citing the Gabbs rulings. Gabbs Exploration Company, 67 I.D. 160 (1960); Gabbs Exploration Company, A-28213 (May 24, 1960) and A-28213 (Supp.) (July 11, 1960); Garfield County Exploration Company, A-28351 (August 30, 1960).)

proper determination of the initial question, in which case it would be inappropriate for him to reopen the case even though he retains jurisdiction over the land in dispute. This is such a case, for it is now difficult, if not impossible, for the Secretary to determine the facts as to the original abandonment in 1929. Further, nowhere does plaintiff offer any facts showing that its predecessors in interest had *not* abandoned the claims in 1929. This is certainly not a case in which the court should order reopening of the initial contest. Nothing in West v. Standard Oil Company, supra, casts the slightest doubt on this conclusion.

■ Although the early default on the part of the applicant was less questionable in Gabbs than in the case before us, the principle applied in that case is fully applicable here. There they failed to answer. Here they failed to appear at the hearing without good cause but later evidenced approval of the default entered. In each instance the action taken by the Department was a matter of mere error which did not render the proceedings void. Thus, the doctrine of waiver or laches applies. In the case at bar there was an added reason for the Secretary to refuse to reopen and that was the failure of the surviving trustees to disclose the prior proceedings when they reapplied. In this connection we are unimpressed with the testimony of the witnesses Mock and Slusser who were then employed by the Bureau of Land Management that the filing of new applications was an appropriate and expeditious means of obtaining a decision on the validity of the claims.

■ Nor do we consider meritorious the argument that once the claims had been clearlisted there could be no summary modification. This action was entirely justified once the mistake was discovered, and the Department became aware of the prior proceedings. The patents had not been issued at that point and the Department retained the authority to act.

## III.

■ Plaintiff argues at length that the erratic rulings of the Department through the years establishes that it and its predecessors have been treated unjustly. It maintains that the Department holdings that the Sibbald-Thurmond agreement did not render the claims invalid which rulings were made in connection with other claims established a rule of property which precluded the rulings made against the claims in suit. Here again the Department had jurisdiction to correct past rulings which it considered in error. We fail to see that the inconsistency inures to plaintiff's benefit.

\*   \*   \*   \*   \*   \*

For the reasons stated we are of the opinion that the case is wholly lacking in merit. The complaint and the action should be and the same is dismissed. Counsel for the Secretary is directed to prepare a formal judgment finding in favor of the defendant and against the plaintiff, and ordering the dismissal of the action. The Clerk is ordered to withhold the entry of judgment until a formal judgment is signed.